## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| In Re: | ) | **Chapter 7** |
| | ) | |
| **Jacqueline Elizabeth Ard** | ) | **Case No. 25-01384-jd** |
| *dba Global Management Group LLC* | ) | |
| *dba Beachside Estates LLC* | ) | **Judge L Jefferson Davis IV** |
| **and Terry Frank Nicola** | ) | |
| *dba Beachside Estates LLC* | ) | |
| *dba Global Management Group*, | ) | |
| | ) | |
| **Debtors.** | ) | |

## AMENDED NOTICE OF MOTION SEEKING AN ORDER MOTION SEEKING AN ORDER GRANTING IN REM RELIEF PURSUANT TO 11 U.S.C. §362(d)(4) AND ABANDONMENT

Nationstar Mortgage LLC has filed papers with the court to grant an order granting in rem relief pursuant to 11 U.S.C. §362(d)(4) and abandonment

<u>**Your rights may be affected**</u>. **You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case. (If you do not have an attorney, you may wish to consult one.)**

If you do not want the court to [relief sought in motion or objection], or you want the court to consider your views on the motion, then within fourteen <u>(14) days</u> of service of this notice, you or your attorney must:

File with the court a written response, return, or objection at:

>1100 Laurel Street
>Columbia, SC 29201

Responses, returns, or objections filed by an attorney must be electronically filed in ecf.scb.uscourts.gov.

If you mail your response, return, or objection to the court for filing, you must mail it early enough so the court will **receive** it on or before the date stated above.

You must also send a copy to:

>Elizabeth Parrott
>1544 Old Alabama Rd
>Roswell GA  30076
>
>Kevin Campbell
>PO Box 684
>Mount Pleasant, SC 29465

1

US Trustee's Office
Strom Thurmond Federal Building
1835 Assembly Street
Suite 953
Columbia, SC 29201

    Attend the hearing scheduled to be heard on January 7, 2026 at 10:30 a.m. at the United States Bankruptcy Court, King and Queen Building 145 King Street, Room 225 Charleston, SC 29401

    If you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the motion and may enter an order granting that relief prior to the scheduled hearing date, if determined to be appropriate.

Date: _12/1/2025_____          /S/Elizabeth Parrott_

Elizabeth Parrott
1544 Old Alabama Rd
Roswell GA  30076
678-277-4911
Elizabeth.parrott@mccalla.com
Dist CT ID 13022

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| In Re: | ) | Chapter 7 |
| | ) | |
| Jacqueline Elizabeth Ard | ) | Case No. 25-01384-jd |
| *dba Global Management Group LLC* | ) | |
| *dba Beachside Estates LLC* | ) | Judge L Jefferson Davis IV |
| and Terry Frank Nicola | ) | |
| *dba Beachside Estates LLC* | ) | |
| *dba Global Management Group*, | ) | |
| | ) | |
| Debtors. | ) | |

**MOTION SEEKING AN ORDER:**
**GRANTING IN REM RELIEF PURSUANT TO 11 U.S.C. §362(d)(4)**

Comes now Nationstar Mortgage LLC, its successors or assigns, a secured creditor of the above-named Debtors, and moves the Court for an Order granting relief from the automatic stay provisions of 11 USC §362(a) and directing abandonment of Property by the Trustee pursuant to 11 USC §554(b). In support, Movant would show the following:

1.

Jacqueline Elizabeth Ard *dba Global Management Group LLC dba Beachside Estates LLC* and Terry Frank Nicola *dba Beachside Estates LLC dba Global Management Group*, hereinafter known as Respondents, filed a Petition for Relief under 11 U.S.C. Chapter 13 on April 10, 2025, and is therefore subject to the jurisdiction of this Court. Thereafter, on September 9, 2025, the Debtors converted the to a case under 11 U.S.C. Chapter 7.

2.

Kevin Campbell, ("the Trustee") is the Chapter 7 Trustee and party to this action.

3.

This matter is a core proceeding pursuant to 28 USC §157, and the court has jurisdiction pursuant to 28 USC §§151, 157 and 1334. This is a contested proceeding within the meaning of Bankruptcy Rule 9014, and the Bankruptcy Court has jurisdiction over this matter.

4.

Nationstar Mortgage LLC, its successors or assigns, hereinafter referred to as Movant, is a secured creditor of Debtors pursuant to a Note and Mortgage. Jacqueline Ard and Terry Nicola excuted a Note, dated January 26, 2022, in the original principal amount of $190,000.00 (attached hereto as Exhibit "A"). The Note is secured by a Mortgage executed by Debtors, dated January 26, 2022, which conveys certain property now or formerly known as 663 William Hilton Pkwy., Apt. 4408, Hilton Head Island, South Carolina 29928. Said Mortgage is recorded on February 7, 2022 in Book 4112, Page 2810 to 2826, and further as File Num 2022007885 in Beaufort County, North Carolina Records (attached hereto as Exhibit "B").  The Mortgage was subsequently assigned to Movant as evidenced by the Assignment of Mortgage recorded on October 16, 2024 in Book 4375, Page 0483, and further as 2024045382 in Beaufort County, North Carolina Records (attached hereto as Exhibit "C").

5.

Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase order, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements in support of right to seek a lift of the automatic stay and foreclose if necessary.

6.

 The Present Case is the third (3rd) bankruptcy case commenced by the Debtors in less than a twelve-month period. The cases filed by the Debtor are:

    a.  Case Number 24-03611-jd, Chapter 13 filed pro se on October 4, 2024 in the District of South Carolina and Dismissed on November 21, 2024 for failure to file the required documentation necessary to prosecute the case.

b. Case Number 25-40952-mlo, Chapter 13 filed pro se on January 31, 2025 in the Eastern District of Michigan and Dismissed on March 3, 2025 for to file the required documentation necessary to prosecute the case.

c. Current Case Number 25-01384-jd, Chapter 13 filed pro se on April 10, 2025. The Pro Se Debtors filed a Motion to Impose the Stay on April 18, 2025. The Motion was denied on May 23, 2025.

**THERE IS NO AUTOMATIC STAY IN PLACE IN THE PRESENT CASE**

7.

The Debtors' case filings in October 2024 and January 2025 resulted in dismissals without any attempt by Debtors to provide for treatment of the mortgage based debt or disposition of the Property. The dismissals occurred on November 21, 2024 and March 3, 2025. Both dismissal dates are within one year prior to the commencement of the Present Case.

8.

Because of the filings and dismissals of the prior two cases within a year of the commencement of the Present Case, there is no automatic stay in place as provided under Bankruptcy Code section 362(c)(4)(A)(i). The Debtor has not filed a motion seeking imposition of the automatic stay in Present Case. Under Section 362(c)(4)(A)(ii), Secured Creditor may seek an order of this Court confirming that there is no automatic stay in the Present Case.

**BASIS FOR RELIEF**

**A. In Rem Relief is Warranted**

1.

All of the prior dismissed cases of Debtors were filed post mortgage default. With the dismissal of the two prior cases, the Debtor did not seek to use of the bankruptcy code to provide

5

for the satisfaction of the mortgage, seek loss mitigation (if it were available) or to provide for disposition of the Debtor's interest in the Property.  Rather, the Debtor cases were timed and filed to gain advantage of the automatic stay to impede the Foreclosure Action, and sale of the Property.

2.

In the Present Case, it does not appear that the Debtor will be using of the bankruptcy code to provide for the satisfaction of the mortgage as they have converted to a liquidation case.

3.

The Debtors repeated use of bankruptcy case filings concerning the Property while the Foreclosure Action has been pending has had the actual consequence of stalling Secured Creditor in exercising its rights.   There is no valid financial restructuring or relief with respect to the Property or the liability under the mortgage.  The only thing that has happened with each successive case filing is the application of the stay, that has only delayed the inevitable sale of the Property.  This has been a process or "scheme" that has hindered and delayed the sale of the Property.  *See,* In re Waldron*, 785 F.2d 936, 941 (11th Cir. 1986) ("whenever … a petition appears to be tainted by a questionable purpose, it is incumbent upon the bankruptcy courts to examine and question the Debtor's motives").  From the facts present, it can be induced that the Debtors have not been utilizing the bankruptcy process for legitimate financial restructuring concerning the Property, but rather, have manipulated the bankruptcy process to create a running impediment to the enforcement of Secured Creditor's rights.   It is respectfully submitted that this is a demonstrable example of bad faith.

4.

The Bankruptcy Code does not define good faith nor is there an explicit requirement that petitions be filed in good faith; yet, bankruptcy courts have repeatedly lifted the automatic stay

and dismissed cases as bad faith filings.  The inference that good faith is required in order for

debtors to continue to enjoy the exceptional relief afforded by the automatic stay and the other

provisions of the Bankruptcy Code upholds the integrity of the bankruptcy courts:

> Every bankruptcy statute since 1898 has incorporated literally, or by
> judicial interpretation, a standard of good faith for the commencement,
> prosecution, and confirmation of bankruptcy proceedings.  Such a
> standard furthers the balancing process between the interest of Debtors
> and creditors which characterizes so many provisions of the bankruptcy
> laws and is necessary to legitimize the delay and costs imposed upon
> parties to a bankruptcy.  Requirement of good faith prevents abuse of the
> bankruptcy process by Debtors whose overriding motive is to delay
> creditors without benefitting them in any way or to achieve reprehensible
> purposes.  Moreover, a good faith standard protects the jurisdictional
> integrity of the bankruptcy courts by rendering their most powerful
> equitable weapons (i.e., avoidance of liens, discharge of debts,
> marshaling and turnover of assets) available only to those Debtors and
> creditors with "clean hands."

In re Little Creek Dev. Co., 779 F.2d 1068, 1071-72 (5th Cir. 1986) (citations omitted).  *See, also,*

In re Waldron, 785 F.2d 936 (11th Cir. 1986).

5.

The Eleventh Circuit's analysis in In re Kitchens, 702 F.2d 885 (11th Cir. 1983) was based

on a "totality of the circumstances" approach to analyzing good faith, which involves consideration

of a number of factors including the conduct of the debtor.  The other Circuits have adopted similar

analysis and criteria.

6.

According to Kitchens, the prior conduct of a debtor can be considered in determining

whether the debtor is demonstrating the sincerity and effort required to be a debtor in bankruptcy.

The Eleventh Circuit listed the following factors, among others, as indicative of bad faith:

(5)    the motivations of the Debtor and his sincerity in seeking relief under the provisions of [the Bankruptcy Code];

(6)    the Debtor's degree of effort;

(9)    the frequency with which the Debtor has sought relief under the Bankruptcy Reform Act and its predecessors; [and]

(10)   the circumstances under which the Debtor has contracted his debts and has demonstrated bona fides, or lack of same, in dealings with his creditors.

Kitchens, 702 F.2d at 888-89.

7.

Based upon the repetitive filings by the Debtor, there is a strong indication that they are attempting to benefit from the use of the Bankruptcy Code to forestall the sale of the Property and remain in possession and occupancy of the Property without cost to them, and in absolute detriment to the Secured Creditor's legitimate rights.

8.

Secured Creditor submits that it is entitled to prospective relief from the automatic stay pursuant to Bankruptcy Code section 362(d)(4) for cause, to wit, the existence of the mortgage default, the repetitive case filings that triggered the automatic stay, and the lack of any viable effort at financial restructuring by the Debtors.  There is strong evidence of bad faith by the Debtors concerning the Property and the use of the bankruptcy process since the mortgage default, s*ee*, In re Little Creek Dev. Co., 779 F.2d 1068 (5th Cir. 1986) and In re Waldron, 785 F.2d 936 (11th Cir. 1986).

WHEREFORE MOVANT PRAYS:

(a)    That this Honorable Court enter an order pursuant to 11 U.S.C. § 362(d)(4) granting *In Rem* prospective relief from an automatic stay in a future bankruptcy case in regard to the Property for a period of two (2) years from the date of entry of the Order to permit Secured Creditor to take any and all steps necessary to exercise any and all rights it may have in the collateral described herein.

(b)      That the Movant's secured property be abandoned as property of the estate;

(c)      That the court waive the 14-Day Stay of Bankruptcy Rule 4001(a)(4); and

(d)      For such other and further relief as this Court deems just and proper.


Respectfully Submitted:


By: /s/Elizabeth H Parrott
Elizabeth H. Parrott (SC 101829  Dist ID  13022)
McCalla Raymer Leibert Pierce, LLP
1544 Old Alabama Road
Roswell, Georgia 30076
678-277-4911
312-803-9663
Elizabeth.Parrott@mccalla.com

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| In Re: | ) | Chapter 7 |
| | ) | |
| Jacqueline Elizabeth Ard | ) | Case No. 25-01384-jd |
| *dba Global Management Group LLC* | ) | |
| *dba Beachside Estates LLC* | ) | Judge L Jefferson Davis IV |
| and Terry Frank Nicola | ) | |
| *dba Beachside Estates LLC* | ) | |
| *dba Global Management Group*, | ) | |
| | ) | |
| Debtors. | ) | |

## CERTIFICATE OF SERVICE

I, the undersigned, Elizabeth H. Parrott, of McCalla Raymer Leibert Pierce, LLP, 1544 Old Alabama Road, Roswell, Georgia 30076, certify under penalty of perjury pursuant to 28 U.S.C. Sec. 1746:

That I am, and at all times hereinafter mentioned, was more than 18 years of age;

That on 12/1/2025, I served a copy of the **AMENDED IN REM MOTION FOR RELIEF FROM AUTOMATIC STAY** to be filed in this bankruptcy matter by depositing a copy of the same in the United States Mail in a properly addressed envelope with adequate postage thereon to the said parties at:

*Pro Se Debtor*
Jacqueline Elizabeth Ard
21215 Dartmouth Dr
Southfield, MI 48076-5634

*Pro Se Joint Debtor*
Terry Frank Nicola
21215 Dartmouth Dr
Southfield, MI 48076-5634

*Trustee*
Kevin Campbell
PO Box 684
Mount Pleasant, SC 29465

*U.S. Trustee*
US Trustee's Office
Strom Thurmond Federal Building
1835 Assembly Street
Suite 953
Columbia, SC 29201


I CERTIFY UNDER PENALTY OF PERJURY PURSUANT TO 28 U.S.C. SEC. 1746 THAT
THE FOREGOING IS TRUE AND CORRECT.


Executed on 12/1/2025                    By: /s/Elizabeth H Parrott_____
                                             Elizabeth H. Parrott
                                             SC 101829
                                             Dist ID 13022

# EXHIBIT A

# NOTE

MIN: ██████████████████                                    Loan Number: ████████

JANUARY 26, 2022                    CLARKSVILLE                    INDIANA
[Date]                              [City]                         [State]

663 WILLIAM HILTON PKWY APT 4408, HILTON HEAD ISLAND, SOUTH CAROLINA 29928

[Property Address]

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 190,000.00        (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is FIRST SAVINGS BANK, A STATE CHARTERED BANK

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of      2.875  %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3.  PAYMENTS

### (A)  Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the  1st  day of each month beginning on        MARCH 1        , 2022   . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on  FEBRUARY 1, 2037        , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at  301 SOUTHERN INDIANA AVENUE, JEFFERSONVILLE, INDIANA 47130

or at a different place if required by the Note Holder.

### (B)  Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $  1,300.71        .

## 4.  BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5.  LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit;

Mortgage Lender/Servicer: FIRST SAVINGS BANK NMLS # ████████

and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6.  BORROWER'S FAILURE TO PAY AS REQUIRED

### (A)  Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of        15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be         5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B)  Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C)  Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D)  No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E)  Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7.  GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8.  OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9.  WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10.  UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep

the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

     If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

     If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.


_____ (Seal)
Terry Nicola                         -Borrower


Universal Loan ID: ███████████
Loan Originator: MARTINA ANDRIA ABDULNOOR, NMLSR ID ███████
Loan Originator Organization: FIRST SAVINGS BANK, NM███████
Loan Originator Organization: FIRST SAVINGS BANK, NM███████

*[Sign Original Only]*

# ALLONGE

**Loan Number:** ▮▮▮▮▮▮

**Loan Date:** JANUARY 26, 2022

**Borrower(s):** Terry Nicola

**Property Address:** 663 WILLIAM HILTON PKWY APT 4408, HILTON HEAD ISLAND, SOUTH CAROLINA 29928

**Principal Balance:** $190,000.00

### PAY TO THE ORDER OF

### Without Recourse

Company Name: FIRST SAVINGS BANK

By: _____          _____
            Denise Buel                                                    (Title)
       Operations Manager

# EXHIBIT B

BK 4112 Pgs 2610-2628
FILE NUM 2022007885
02/07/2022 11:37:31 AM
RCPT# 1076072
RECORDING FEES 25.00

After Recording Return To:
FIRST SAVINGS BANK
501 EAST LEWIS & CLARK PARKWAY
CLARKSVILLE, INDIANA 47129
Loan Number: ██████████

──────────── [Space Above This Line For Recording Data] ────────────

# MORTGAGE

**MIN:** ████████████████              **MERS Phone: 888-679-6377**

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) **"Security Instrument"** means this document, which is dated   JANUARY 26, 2022        , together with all Riders to this document.
(B) **"Borrower"** is   TERRY NICOLA AND JACQUELINE ARD, AS JOINT TENANTS WITH RIGHTS OF SURVIVORSHIP

Borrower is the mortgagor under this Security Instrument.
(C) **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(D) **"Lender"** is   FIRST SAVINGS BANK

Lender is a  STATE CHARTERED BANK                                                organized
and existing under the laws of    INDIANA
Lender's address is   501 EAST LEWIS & CLARK PARKWAY, CLARKSVILLE, INDIANA 47129

(E) **"Note"** means the promissory note signed by Borrower and dated   JANUARY 26, 2022
The Note states that Borrower owes Lender   ONE HUNDRED NINETY THOUSAND AND 00/100
                          Dollars (U.S. $ 190,000.00         ) plus interest.
Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than
FEBRUARY 1, 2037       .
(F) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

Mortgage Lender/Servicer: FIRST SAVINGS BANK NMLS # ██████████
SOUTH CAROLINA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS          ☆DocMagic
Form 3041  1/01
Page 1 of 14

(G)  **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H)  **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | | |
|---|---|---|---|
| ☐ | Adjustable Rate Rider | ☐ | Planned Unit Development Rider |
| ☐ | Balloon Rider | ☐ | Biweekly Payment Rider |
| ☐ | 1-4 Family Rider | ☐ | Second Home Rider |
| ☒ | Condominium Rider | ☐ | Other(s) [specify] |

(I)  **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J)  **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K)  **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L)  **"Escrow Items"** means those items that are described in Section 3.

(M)  **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N)  **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O)  **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P)  **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q)  **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the

COUNTY                         of                        BEAUFORT                      :
[Type of Recording Jurisdiction]                          [Name of Recording Jurisdiction]

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART THEREOF
A.P.N.: ███████████████

which currently has the address of            663 WILLIAM HILTON PKWY APT 4408
                                                          [Street]

    HILTON HEAD ISLAND          , South Carolina      29928      ("Property Address"):
        [City]                                      [Zip Code]

TO HAVE AND TO HOLD this property unto MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of

its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2.   Application of Payments or Proceeds.**   Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority:  (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3.  Such payments shall be applied to each Periodic Payment in the order in which it became due.  Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full.  To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.  Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3.   Funds for Escrow Items.**   Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for:  (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items."  At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item.  Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section.  Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items.  Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time.  Any such waiver may only be in writing.  In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require.  Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9.  If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan

Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4.   Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5.   Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed

by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8.    Borrower's Loan Application.**  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9.    Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10.    Mortgage Insurance.**  If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and

Lender providing for such termination or until termination is required by Applicable Law.  Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed.  Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses.  These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements.  These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses.  If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance."  Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan.  Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law.  These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11.  Assignment of Miscellaneous Proceeds; Forfeiture.**  All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened.  During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.  Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds.  If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.  Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction:  (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value.  Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise

agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment

to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose

of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances**. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not

limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.   Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property.   The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure.   If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding.   Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence, all of which shall be additional  sums secured by this Security Instrument.**

**23. Release.**  Upon payment of all sums secured by this Security Instrument, this Security Instrument shall become null and void.  Lender shall release this Security Instrument.  Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Homestead Waiver.**  Borrower waives all rights of homestead exemption in the Property to the extent allowed by Applicable Law.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

**25. Waiver of Appraisal Rights.** The laws of South Carolina provide that in any real estate foreclosure proceeding a defendant against whom a personal judgment is taken or asked may within 30 days after the sale of the mortgaged property apply to the court for an order of appraisal. The statutory appraisal value as approved by the court would be substituted for the high bid and may decrease the amount of any deficiency owing in connection with the transaction. TO THE EXTENT PERMITTED BY LAW, THE UNDERSIGNED HEREBY WAIVES AND RELINQUISHES THE STATUTORY APPRAISAL RIGHTS WHICH MEANS THE HIGH BID AT THE JUDICIAL FORECLOSURE SALE WILL BE APPLIED TO THE DEBT REGARDLESS OF ANY APPRAISED VALUE OF THE MORTGAGED PROPERTY. This waiver shall not apply so long as the Property is used as a dwelling place as defined in §12-37-250 of the South Carolina Code of Laws.

**26. Future Advances.** The lien of this Security Instrument shall secure the existing indebtedness under the Note and any future advances made under this Security Instrument up to 150% of the original principal amount of the Note plus interest thereon, attorneys' fees and court costs.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
Terry Nicola                    -Borrower

_____ (Seal)
Jacqueline Ard                  -Borrower

Signed, sealed and delivered in the presence of:

_____
Witness

_____
Witness

——————————————— [Space Below This Line For Acknowledgment] ———————————————

State of __SOUTH CAROLINA__

County of __BEAUFORT__

     The foregoing instrument was acknowledged before me this _____

                                                      (date)

by __Terry Nicola AND Jacqueline Ard__

_____

_____

                           (names of person acknowledging)

                                          _____

                                          Signature of Person Taking Acknowledgment

                                          _____

                                          Title or Rank

                (Seal or Stamp)                    _____

                                          Serial Number, if any

                          *L/C*

                  *MICHIGAN*

State of ~~SOUTH CAROLINA~~

                    *F/C -*

~~BEAUFORT~~ *OAKLAND* _____ County

     I certify that __*TERRY NICOLA AND JACQUELINE ARD*__
                             (name of subscribing witness)

personally appeared before me this day and certified to me under oath or by affirmation that he or she is not a grantee
or beneficiary of the transaction, signed the foregoing document as a subscribing witness, and either ☐ witnessed

__Terry Nicola AND Jacqueline Ard_____ sign the foregoing document
               (name of principal)

or ☐ witnessed __Terry Nicola AND Jacqueline Ard_____
                        (name of principal)

acknowledge his or her signature on the already-signed document.

Date: __*JANUARY 26, 2022*__                    *K. C___*
                                      (Signature of Notary)

                                          *K. CAMERON*
                                          (Notary's Printed or Typed Name)

> **K. CAMERON**
> Notary Public, State of Michigan
> County of Oakland
> My Commission Expires Dec. 28, 2025
> Acting in the County of *OAKLAND*

                                   Notary Public for ~~South Carolina~~ *Michigan  KC*

           (Official Seal)                 My Commission Expires: __*12·28·2025*__

Loan Originator: MARTINA ANDRIA ABDULNOOR, NMLSR ID
Loan Originator Organization: FIRST SAVINGS BANK, NM█████████
Loan Originator Organization: FIRST SAVINGS BANK, NM███████████

**EXHIBIT "A"**
**LEGAL DESCRIPTION**

Apartment No. 4405 of Hilton Head Resort 'Four Seasons Centre' Horizontal Property Regime, (a condominium) A Horizontal Property regime established pursuant to the South Carolina Horizontal Property Act, Title 27, Chapter 31, Code of Laws of South Carolina (1976), and submitted by Master Deed Dated November 9, 1982 and recorded November 10, 1982 in the Office of the Register of Deeds for Beaufort County, South Carolina, in Deed Book 357 at Page 447, amended by Amendment recorded in Deed Book 367 at Page 911.

Being the same property conveyed to Terry Nicola and Jacqueline Ard, as joint tenants with rights of survivorship by General Warranty Deed from Edmund J. Sweeney of record as Instrument No. (book) 4014 / (page) 0959   in the Register's Office for Beaufort County, South Carolina, dated May 3, 2021 and recorded on May 20, 2021.

Being also known as 663 William Hilton Parkway, Unit 4408, Hilton Head Island, SC  29928

File No ████████████

# CONDOMINIUM RIDER

Loan Number: ███

THIS CONDOMINIUM RIDER is made this 26th  day of          JANUARY, 2022          ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to
secure Borrower's Note to  FIRST SAVINGS BANK, A STATE CHARTERED BANK

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

    663 WILLIAM HILTON PKWY APT 4408, HILTON HEAD ISLAND, SOUTH CAROLINA 29928
                               [Property Address]

The Property includes a unit in, together with an undivided interest in the common elements of, a
condominium project known as:

                        HH RESORT / FOUR SEASONS
                        [Name of Condominium Project]

(the "Condominium Project"). If the owners association or other entity which acts for the Condominium
Project (the "Owners Association") holds title to property for the benefit or use of its members or
shareholders, the Property also includes Borrower's interest in the Owners Association and the uses, proceeds
and benefits of Borrower's interest.

   **CONDOMINIUM COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

   **A. Condominium Obligations.** Borrower shall perform all of Borrower's obligations under the
Condominium Project's Constituent Documents. The "Constituent Documents" are the: (i) Declaration or
any other document which creates the Condominium Project; (ii) by-laws; (iii) code of regulations; and (iv)
other equivalent documents. Borrower shall promptly pay, when due, all dues and assessments imposed
pursuant to the Constituent Documents.

   **B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted
insurance carrier, a "master" or "blanket" policy on the Condominium Project which is satisfactory to Lender
and which provides insurance coverage in the amounts (including deductible levels), for the periods, and
against loss by fire, hazards included within the term "extended coverage," and any other hazards, including,
but not limited to, earthquakes and floods, from which Lender requires insurance, then: (i) Lender waives
the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for
property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property
insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided
by the Owners Association policy.
   What Lender requires as a condition of this waiver can change during the term of the loan.


Mortgage Lender/Servicer: FIRST SAVINGS BANK NMLS # ███

---

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender for application to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C.  Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D.  Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property, whether of the unit or of the common elements, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11   .

**E.  Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Condominium Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the Constituent Documents if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F.  Remedies.** If Borrower does not pay condominium dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Condominium Rider.

_____ (Seal)
Terry Nicola                          -Borrower

_____ (Seal)
Jacqueline Ard                        -Borrower

MULTISTATE CONDOMINIUM RIDER
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3140 1/01                        Page 3 of 3                          ☆DocMagic

# EXHIBIT C

BEAUFORT COUNTY SC - ROD
04LS
2024045382  ASSIG
10/16/2024  09:32:44 AM
RCPT# ▮▮▮▮▮
RECORDING FEES 10.00

Recording Requested By:
NATIONSTAR MORTGAGE DBA MR. COOPER

When Recorded Return To:

DOCUMENT ADMINISTRATION
NATIONSTAR MORTGAGE DBA MR. COOPER
8950 CYPRESS WATERS BLVD
COPPELL, TX  75019

## CORPORATE ASSIGNMENT OF MORTGAGE

**Beaufort, South Carolina**
**SELLER'S SERVICING #**▮▮▮▮ "NICOLA"

**MIN #:**▮▮▮▮ SIS #: 1-888-679-6377

Date of Assignment: October 9th, 2024
Assignor: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS MORTGAGEE, AS NOMINEE FOR FIRST SAVINGS BANK, ITS SUCCESSORS AND ASSIGNS at P.O. BOX 2026, FLINT, MI 48501-2026
Assignee: NATIONSTAR MORTGAGE LLC at 8950 CYPRESS WATERS BLVD., COPPELL, TX  75019

Executed By: TERRY NICOLA AND JACQUELINE ARD, AS JOINT TENANTS WITH RIGHTS OF SURVIVORSHIP To: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS MORTGAGEE, AS NOMINEE FOR FIRST SAVINGS BANK, ITS SUCCESSORS AND ASSIGNS
Date of Mortgage: 01/26/2022  Recorded: 02/07/2022  in Book/Reel/Liber: 4112 Page/Folio: 2810 as Instrument No.: 2022007885 In the County of Beaufort, State of South Carolina.

Property Address: 663 WILLIAM HILTON PKWY APT 4408, HILTON HEAD ISLAND, SC  29928

   KNOW ALL MEN BY THESE PRESENTS, that for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said Mortgage having an original principal sum of $190,000.00 with interest, secured thereby, and the full benefit of all the powers and of all the covenants and provisos therein contained, and the said Assignor hereby grants and conveys unto the said Assignee, the Assignor's interest under the Mortgage.

   TO HAVE AND TO HOLD the said Mortgage, and the said property unto the said Assignee forever, subject to the terms contained in said Mortgage.

   MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS MORTGAGEE, AS NOMINEE FOR FIRST SAVINGS BANK, ITS SUCCESSORS AND ASSIGNS
On October 9th, 2024

By: _____
TSEDALE ALEMU, Vice-President

WITNESS                                        WITNESS
_____                                _____
Elisha Thompson                                Joel Pagan

STATE OF Texas
COUNTY OF Denton

On October 9th, 2024, before me, SYLVIA RAMIREZ, a Notary Public in and for Denton in the State of Texas, personally appeared TSEDALE ALEMU , Vice-President of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS MORTGAGEE, AS NOMINEE FOR FIRST SAVINGS BANK, ITS SUCCESSORS AND ASSIGNS, personally known to me to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

_____
SYLVIA RAMIREZ
Notary Expires: 03/13/2027

SYLVIA RAMIREZ
Notary Public, State of Texas
Comm. Expires 03-13-2027
Notary ID ▮▮▮▮

(This area for notarial seal)